## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **MICHAEL A. CRABTREE, *et al.*,** | |
| Plaintiffs, | |
| v. | Case No. 1:19-cv-01596 (TNM) |
| **MILLER PIPELINE, LLC**, | |
| Defendant. | |

## <u>MEMORANDUM OPINION & ORDER</u>

This case centers on a dispute over unpaid contributions under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiffs, four pension funds ("Funds"), argue that Miller Pipeline, LLC ("Miller") has failed to pay fringe benefits on time covered by the applicable collective bargaining agreement ("CBA")—specifically, on hours operating engineers spend in trainings and safety meetings, as well as on reporting time. The Funds also contend that Miller's timekeeping records are inadequate because they cannot determine whether certain payroll codes capture additional hours covered by the CBA. So they seek contributions on all hours recorded under those payroll codes. Finally, they seek an audit of Miller's records.

The parties both moved for partial summary judgment. Because the Court determines that the CBA does not cover trainings, safety meetings, and reporting time, Miller does not owe the Funds contributions on such hours. The Court finds, however, that neither side is entitled to summary judgment on the adequacy of Miller's records. A genuine dispute of material fact remains that an audit, which the Funds request and which Miller does not oppose, can likely resolve. The Court will therefore grant in part and deny in part each side's motion for partial summary judgment.

## I.

## A.

Plaintiffs are four multiemployer employee benefit funds.[1] Pls.' Statement in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' Mot.") at 6, ECF No. 31-1.[2] The Funds are organized under ERISA, 29 U.S.C. § 1001 *et seq.* Pls.' Statement of Material Facts ("PSMF") ¶¶ 1, 3, 5, 7, ECF No. 31-2. Employers finance the Funds through contributions under CBAs made between employers and the International Union of Operating Engineers ("IUOE") and IUOE's local unions. *Id.* ¶ 9. IUOE represents operating engineers "who work operating cranes, trenching and boring machines, excavators, and other heavy equipment, as well as stationary engineers who are responsible for the care and maintenance of systems within buildings." *Id.* ¶ 13.

Miller "provides a comprehensive range of pipeline contracting and rehabilitation services for natural gas, liquids, water, and wastewater pipelines." Def.'s Statement of Material Facts ("DSMF") ¶ 1, ECF No. 32-2.[3] It has more than 3,600 employees and operates across 20

---

[1] The four Plaintiffs are: (1) Michael Crabtree, as Chief Executive Officer of the Central Pension Fund of the International Union of Operating Engineers and Participating Employers ("Pension Fund"); (2) the Board of Trustees of the International Union of Operating Engineers and Pipe Line Employers Health and Welfare Fund ("Health and Welfare Fund"); (3) the Board of Trustees of the International Union of Operating Engineers and PLCA National Pipe Line Training Fund ("Pipe Line Training Fund"); and (4) the Board of Trustees of the International Union of Operating Engineers National Training Fund ("National Training Fund"). Pls.' Statement in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' Mot.") at 6, ECF No. 31-1.

[2] All page citations refer to the page numbers that the CM/ECF system generates.

[3] Miller did not comply with the directives in the Court's Standing Order in submitting its statement of facts. *See* Standing Order at 6, ECF No. 3 (requiring "[t]he party responding to a statement of material facts" to "respond to each paragraph with a **correspondingly numbered paragraph**, indicating whether that paragraph is admitted or denied" (emphasis in original)). Instead, it responded to paragraphs in the Funds' statement in groups. *See, e.g.*, Def.'s Resp. to PSMF ¶ 1, ECF No. 32-3 (not disputing "the statements in Paragraphs 1-11"). If Miller has not specifically stated that "facts are controverted in [its] statement filed in opposition," "[t]he Court

states.  *See* Def.'s Mem. in Opp'n to Pls.' Mot. & in Supp. of Def.'s Mot. for Partial Summ. J. ("Def.'s Opp'n/Cross-Mot.") at 6, ECF No. 32-1.  It admits that it is an employer covered by ERISA.  *See* PSMF ⁋ 10; Def.'s Resp. to PSMF ⁋ 1, ECF No. 32-3.

Miller is bound by agreements with each of the Funds.  *See* PSMF ⁋⁋ 28, 31, 34, 38.  The agreements all obligate Miller to "make prompt contributions or payments to the Trust Fund in such amount and under the terms as are provided for in the applicable collective bargaining agreement."  *Id.* ⁋ 29 (cleaned up); *see also id.* ⁋⁋ 32, 35, 39.  The agreements also allow fund trustees to "audit and examine the pertinent employment and payroll records of each Employer." *Id.* ⁋ 30; *see also id.* ⁋⁋ 33, 36, 40.

The applicable CBA here, which sets out the terms by which Miller must contribute to the Funds, is the National Distribution and Utilities Construction and Maintenance Agreement ("Distribution Agreement" or "the Agreement").  *See id.* ⁋⁋ 9, 11.  IUOE and the Distribution Contractors Association ("DCA"), a multiemployer association to which Miller belongs, executed the Agreement.  *Id.* ⁋ 13; DSMF ⁋⁋ 3, 5.  Miller has thus been bound by the Agreement at all times relevant to the parties' dispute.  PSMF ⁋ 11.

The Agreement sets out articles that cover various topics.  Four articles are particularly relevant here: Article I, which denotes "Coverage" and describes the types of "[d]istribution work coming under th[e] Agreement"; Article VI, which covers "Wage Rates and Classifications" and further describes "[t]he work . . . covered by the terms of th[e] contract"; Article VII, providing for the method of employer contributions to the National Training Fund in particular; and Article X, which covers "Reporting Pay," meaning the pay that Miller provides an

---

may assume that facts identified by the moving party in its statement of material facts are **admitted**."  Standing Order at 7 (emphasis in original).

operator when he reports on duty but cannot work because no task is available or the weather cut short his workday.  Pls.' App. in Supp. of Pls.' Mot. for Partial Summ. J. ("Pls.' App.") at 59, 62–64, ECF No. 31-3.

Also relevant to the parties' dispute, Miller uses payroll codes to categorize the type of work that its operating engineers perform.  PSMF ℙ 42.  Miller considers hours recorded under certain payroll codes as work "covered" by the Distribution Agreement.  *Id.* ℙ 46.  For example, Miller would categorize time recorded under the payroll code "U5/V1 Equip Maintenance" as work "covered" by the Distribution Agreement.  *Id.* ℙ 47.  But time recorded as "01 Vacation" would not be.  *Id.* ℙ 49.

## B.

The Funds sued in 2019, alleging that Miller failed to contribute to them for work performed between 2008–2015 based on the results of prior audits.  *Id.* ℙℙ 83, 87–89; Compl. ℙℙ 17, 23, 29, 37, ECF No. 1.  The parties participated in mediation and "resolved a substantial portion of" the case.  Joint Status Report (Jan. 31, 2020) at 1, ECF No. 18.  Miller agreed to perform an internal preliminary assessment of its payroll records and remittance reports to identify the benefits contributed (and not contributed) between July 1, 2015 and January 31, 2020.  *Id.*; Def.'s Opp'n/Cross-Mot. at 16.  The results ("Preliminary Assessment") were captured in an Excel sheet and provided to the Funds.  PSMF ℙ 91; Def.'s Opp'n/Cross-Mot. at 16, 18.

The Preliminary Assessment led the Funds to file an amended complaint—the operative one here.  PSMF ℙℙ 91–92; Am. Compl., ECF No. 24.  The Funds alleged two counts: (1) that Miller failed to pay contributions owing to the funds during the 2015–2020 period, in violation of ERISA and Miller's contractual obligations; and (2) that the Funds had a right to conduct an

audit of Miller's records, at Miller's expense, "for the period of July 2015 through the present," which would "permit the Plaintiffs to determine whether the Defendant is properly reporting and paying the contribution amounts owed to the Plaintiffs."  Am. Compl. ¶¶ 19–21, 25.

Before the Court are the parties' cross-motions for partial summary judgment.  As to Count 1 (unpaid contributions), the parties cross-move on two distinct issues: (1) whether the Agreement requires Miller to contribute on time operating engineers spend in training and safety meetings, as well as on "show up" time; and (2) whether Miller's recordkeeping is inadequate for certain payroll codes and so the Funds should receive unpaid contribution on all hours recorded under them.  *See* Pls.' Mot. at 17, 35; Def.'s Opp'n/Cross-Mot. at 19, 27.  The Court construes the Funds' partial motion as reserving the issue of damages on Count 1.  *See, e.g.*, Pls.' Mot. at 13 ("If the Court grants partial summary judgment in favor of the Plaintiffs as sought herein and determines that these types of work are covered by the Agreement, the remaining issues can be resolved among the parties or through a subsequent damages hearing or damages briefing.").

As to Count 2, the Funds move for an audit, *see id.* at 49, and Miller does not oppose this request, *see, e.g.*, Def.'s Opp'n/Cross-Mot. at 19–30 (not addressing the Funds' request for an audit); *id.* at 29 (suggesting that the Funds might conduct an audit by stating that "[t]he auditors would easily identify such alleged errors and could easily follow up and determine any contribution shortfalls").  The Court thus construes Miller's partial motion as requesting summary judgment on Count 1,[4] but not contesting the Funds' claim to an audit on Count 2.

The motions are ripe for disposition.[5]

---

[4]  Miller does not dispute that it owes contributions to Plaintiff National Training Fund and so does not move for summary judgment against it. *See* Def's Opp'n/Cross-Mot. at 24 n.4.

[5]  The Court has jurisdiction under 29 U.S.C. § 1132(e)(1) and 28 U.S.C. § 1367.

## II.

To succeed on a motion for summary judgment, a movant must show that "there is no genuine dispute as to any material fact" and that it "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A factual dispute is considered material if it could alter the outcome of the suit under the substantive governing law, and genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The "party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp v. Catrett*, 477 U.S. 317, 323 (1986).

Once this showing is made, the nonmoving party must provide "specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250 (cleaned up). In ruling on a summary judgment motion, "all justifiable inferences" from the facts in the record must be drawn in favor of the nonmoving party. *Id.* at 255. But the nonmoving party must show that "a rational trier of fact" could find in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court may grant summary judgment "[i]f the evidence is merely colorable" or "is not significantly probative." *Anderson*, 477 U.S. at 249–50.

## III.

The Funds' primary contention is that Miller has failed to contribute on certain hours recorded by Miller's operating engineers. *See* Pls.' Mot. at 6. ERISA requires that

> [e]very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent with law, make such contributions in accordance with the terms and conditions of such plan or such agreement.

6

29 U.S.C. § 1145.  Benefit plans such as the Funds can sue to recover unpaid contributions.  *See*

*Bituminous Coal Operators' Ass'n, Inc. v. Connors*, 867 F.2d 625, 633 (D.C. Cir. 1989) ("[I]n

enacting section 515, Congress was primarily concerned with overdue contributions; the problem

that it sought to address had consistently arisen in situations where a pension fund was seeking to

collect overdue payments from employers.").

The Funds raise two distinct arguments about Miller's alleged failure to contribute: (A)

that the Agreement requires Miller to contribute on hours operating engineers spend in training

and safety meetings, as well as on "show up" time; and (B) that Miller's recordkeeping is so

inadequate as to certain payroll codes that the Funds are entitled to unpaid contributions on time

recorded under those payroll codes.

### A.

The Funds first argue that Miller has failed to make contributions to them under the

Agreement.  *See* Pls.' Mot. at 6.  They contend that the Agreement covers (and therefore that

Miller owes contributions on) hours that bargaining-unit employees spend in training and safety

activities, as well as hours paid for "show up" time (*i.e.*, when operators report to work but

cannot perform work as usual because of the weather or other factors).  *See id.* at 17–35.  Miller

sees it differently.  It contends that the Agreement does not cover this work and that therefore it

does not have to make fringe benefit contributions on these hours.

### 1.

Who prevails depends on the correct interpretation of the Agreement.  Courts "interpret

[CBAs] under federal law," *Flynn v. Dick Corp.*, 481 F.3d 824, 829 (D.C. Cir. 2007), and

"according to ordinary principles of contract law," *M & G Polymers USA, LLC v. Tackett*, 574

U.S. 427, 435 (2015).  When doing so, "as with any other contract, the parties' intentions

control." *Id.* (cleaned up).   And "[w]here the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Id.* (cleaned up).  In other words, "when the language of a contract is clear and unambiguous on its face, a court will assume that the meaning ordinarily ascribed to those words reflects the intention of the parties." *Holland v. Freeman United Coal Mining Co.*, 574 F. Supp. 2d 116, 129 (D.D.C. 2008) (quoting *Mesa Air Grp., Inc. v. Dep't of Transp.,* 87 F.3d 498, 503 (D.C. Cir. 1996)).

If a contract term is ambiguous—meaning that it "is susceptible to more than one interpretation"—then a court "may consider the intent of the parties" in interpreting it. *Flynn*, 481 F.3d at 830 (cleaned up).  But importantly, "a contract is not ambiguous unless, after applying established rules of interpretation, it remains reasonably susceptible to at least two reasonable but conflicting meanings." *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 765 (2018) (cleaned up).  "[A] dispute about the meaning of a contested term" does not "necessarily render[] that term ambiguous." *Holland*, 574 F. Supp. 2d at 129.

"When the intent of the parties is unambiguously expressed in the contract, that expression controls, and the court's inquiry should proceed no further." *Reese*, 138 S. Ct. at 766 (cleaned up).  Thus, when "the contested agreement admits of only one reasonable interpretation," "the dispute may be resolved as a matter of law." *United Mine Workers of Am. 1974 Pension v. Pittston Co.*, 984 F.2d 469, 473 (D.C. Cir. 1993); *Nat'l Shopmen Pension Fund v. Burtman Iron Works, Inc.*, 148 F. Supp. 2d 60, 63 (D.D.C. 2001) ("Generally, interpretation of a facially clear contract is considered a question of law and is for the court." (cleaned up)). Summary judgment is thus appropriate in that event. *Burtman Iron Works*, 148 F. Supp. 2d at 63.

**2.**

The Court begins with the text of the Agreement and what it says about covered work.

As relevant here, Article I of the Agreement detailing "Coverage" states:

> This Agreement shall apply to and cover all distribution pipeline, cable and communications lines . . . construction and maintenance work coming within the jurisdiction of Union, contracted for or performed by Employer within the areas set forth in [an appendix] of this Agreement, as such work is more fully described in paragraphs B and C below.

Pls.' App. at 59. Paragraph B then states that "[d]istribution work coming under this Agreement . . . is defined as follows": "This Agreement shall apply to and cover the repair, maintenance, construction, installation, treating and reconditioning of pipeline systems transporting coal, gas, oil or other similar materials, vapors or liquids . . . ." *Id.*

Article VI, which details "Wage Rates and Classifications," states that "[t]he classifications and wages to be paid for all work covered by this Agreement are set out in" the Agreement's appendices. *Id.* at 62. Paragraph D of that article then specifies that

> [t]he work coming under the jurisdiction of the union and covered by the terms of this contract includes the operation and maintenance and repair of the following equipment: all cranes, trenching machines, backhoes, draglines, bulldozers, boom cats, angle dozers, back fillers, cleaning machines, wrapping machines, tow tractors, bending machines, welding machines, pumps, forklifts, boring machines, straightening machines, directional drilling, skid steer loaders, and any other power operated equipment.

*Id.* at 63.

So under the Agreement, Miller must pay fringe benefits on "work covered by" it. *Id.* at 62. The parties seem to agree that the Agreement covers some types of hours and not others. *See, e.g.*, Pls.' Statement in Reply to Def.'s Opp'n & Opp'n to Def.'s Mot. for Partial Summ. J. ("Pls.' Reply/Opp'n") at 10 n.1, ECF No. 33 (agreeing that Miller need not contribute on hours categorized as vacation, personal paid time, holiday, and bereavement). Their disagreement

hinges on the breadth of the type of "work" considered "covered" under the Agreement and separately, whether the Agreement requires contributions on show up pay.

The Funds argue that "work covered by th[e] Agreement" includes training and safety meetings, which Miller records with the payroll codes "T3/V5 Training OQ," "T9/W0 Training Other," and "36 Safety Meeting." *See* Pls.' Mot. at 22–30. Essentially, the Funds interpret "work covered" to mean work which "Miller assigns to operating engineers" that is "required to effectively complete their duties." *Id.* at 19 (cleaned up). So the Agreement would cover training and safety meetings, but not paid vacation. *See* Pls.' Reply/Opp'n at 10 n.1. The Funds separately assert that Miller must pay fringe benefits on show up time because the Agreement explicitly covers "Reporting Pay." *See* Pls.' Mot. at 30–35.

Miller contends that "work covered by th[e] Agreement" is strictly limited by the Agreement's terms. It argues that covered work means "the repair, maintenance, construction, installation, treating and reconditioning of pipeline systems" (as stated in Article I) or the "operation and maintenance and repair of" power operated equipment (as stated in Article VI). *See* Def.'s Reply in Supp. of Mot. for Partial Summ. J. at 7, ECF No. 36. It therefore says that it does not owe contributions on any hours—including training, safety meetings, and show up time—that do not come under the Agreement's definition of covered work. *See* Def.'s Opp'n/Cross-Mot. at 19–27.

Miller has the better of the dispute. The Funds suggest that the Agreement does not define covered work. *See* Pls.' Reply/Opp'n at 9. But it does. Article I defines with specificity what it means for "work" to be "covered" under the Agreement. That article—which tellingly sets forth the Agreement's "Coverage"—states that the "Agreement shall *apply to and cover* all distribution pipeline, cable and communications lines . . . construction and maintenance

*work* . . . as such work is more fully described in paragraphs B and C below."  Pls.' App. at 59
(emphasis added).  And Paragraph B, in turn, "define[s]" "work coming under th[e] Agreement."
*Id.*  That paragraph sets forth particular types of work which the "Agreement shall *apply to and
cover*"—the "repair, maintenance, construction, installation, treating and reconditioning of
pipeline systems."  *Id.* (emphasis added).

Just as much as Article I describes what the Agreement covers, it also suggests what the
Agreement does *not* cover.  According to the linguistic canon *expressio unius est exclusio
alterius*, "[t]he expression of one thing is the exclusion of another."  Antonin Scalia & Bryan A.
Garner, Reading Law: The Interpretation of Legal Texts 428 (2012); *see also Am. Postal
Workers Union v. U.S. Postal Serv.*, 550 F.3d 27, 30–31 (D.C. Cir. 2008) (approving an
arbitrator's application of *expressio unius* in interpreting an arbitration award, which the court
considered to be "like the interpretation of a contract").  Thus, especially where no other
provisions in the Agreement suggest otherwise, that Article I enumerates specific types of work
strongly implies that the Agreement does not "apply to and cover" other types of work.  *Cf.
Smart v. Gillette Co. Long-Term Disability Plan*, 70 F.3d 173, 179 (1st Cir. 1995) (interpreting a
severance agreement and reasoning that *expressio unius* "instructs that, when parties list specific
items in a document, any item not so listed is typically thought to be excluded"); *Barnes v.
Indep. Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan*, 64 F.3d 1389, 1393 (9th Cir.
1995) (analyzing a benefit plan's agreement and explaining that "[u]nder the doctrine
of *expressio unius est exclusio alterius*, we must assume that by expressly providing for
subrogation in cases in which the Plan makes payment, the Plan document excludes subrogation
when no payment is made").

Article VI gives even more content to the Agreement's definition of covered work. Paragraph D of that article describes that "*work . . . covered by the terms of this contract* includes the operation and maintenance and repair of" 19 types of equipment, as well as "any other power operated equipment." Pls.' App. at 63 (emphasis added). Unlike Article I's definition of covered work, Article VI, Paragraph D does not appear to set forth an exclusive list. The word "includes" is indicative—this paragraph simply provides examples of work that would come under Article I's definition.

Looking at the big picture, then, some work is covered by the Agreement, rendering other types of work not covered. Under the Agreement's plain language, Miller must pay contributions on hours in which employees engage in the "repair, maintenance, construction, installation, treating and reconditioning of pipeline systems." *Id.* at 59. Included in those types of work would be "the operation and maintenance and repair of" the 19 types of equipment listed in Article VI, as well as "any other power operated equipment." *Id.* at 63.

**3.**

So under the Agreement, work is either covered or it is not. The Court now looks to the types of work at issue to decide on which side of the line they fall.[6] The Court will consider hours recorded for (a) training and safety meetings and (b) show up time.

**a.**

The Funds contend that the hours operating engineers spend participating in training and attending safety meetings are covered by the Agreement and that Miller should pay fringe

---

[6] The Court rejects the Funds' argument that Miller "waived its ability" to dispute that work performed under certain payroll codes is not covered by "fail[ing] to identify and establish facts supporting its claim." Pls.' Reply/Opp'n at 11. Such a finding would be a harsh sanction that the Court does not lightly impose. While Miller's filings leave something to be desired, it has sufficiently preserved its arguments.

benefits on them.  *See* Pls.' Mot. at 22–30.  They point to three payroll codes under which Miller records such hours.

    *First*, "T3/V5 Training OQ," which Miller described as hours operating engineers spend obtaining "operator qualifications" ("OQ").  PSMF ¶¶ 61–62.  This training entails operators "siting at a computer taking tests so that they can get their OQ cards so that they can work."  *Id.* ¶ 61.  *Second*, "T9/W0 Training Other."  The Funds contend this code is used for time spent "training to operate heavy equipment," Pls.' Mot. at 24, and a Miller representative described this code as used for "miscellaneous training," such as "asbestos training" or a "special thing that is required," Pls.' App. at 136.  *Third*, "36 Safety Meeting," which Miller uses to record time spent at a four-hour "quarterly safety meeting" held "off the job site in a facility somewhere" and which all Miller employees attend.  PSMF ¶¶ 72–74.  Much of the training "is done online" and the employees "take the test online individually."  *Id.* ¶ 74.

    The Funds contend that work performed under these three payroll codes comes under the Agreement's definition of covered work for essentially four reasons: the training and safety meetings "[1] occur during regular working hours; [2] are a mandatory and intrinsic part of the operating engineers' employment at Miller; [3] are directly related, and indeed *required*, to the performance of the operators' job; and [4] are mandated not only by various governmental entities, but by Miller's customers."  Pls.' Mot. at 21 (emphasis in original).

    The problem for the Funds is that, even taking all that as true, these payroll codes do not capture work that comes under the Agreement's definition of covered work.  Recall that the Agreement covers operating engineers' hours spent "repair[ing], maint[aining], constructi[ng], install[ing], treating and reconditioning . . . pipeline systems," including "operati[ng] and maint[aining] and repair[ing]" power operated equipment.  Pls.' App. at 59, 63.  By contrast, the

trainings entail operators "siting at a computer taking tests" and "*training to* operate heavy equipment"; and the safety meetings entail hours "off the job site" when all employees—not just operating engineers—"take the test online."  PSMF ¶¶ 61, 72, 74; Pls.' Mot. at 24 (emphasis added).

While trainings and safety meetings might be incidental, or even a prerequisite, to covered work, they are not themselves covered work.  Warming up before the big game may be wise or even critical, but it is not baseball.  Had the Agreement defined covered work as including all tasks that are "a mandatory and intrinsic part of the operating engineers' employment," *see* Pls.' Mot. at 21, or stated that covered work included "operati[ng] and maint[aining] and repair[ing] *and training on*" power operated equipment, the Court might reach a different result.  But it does not.  The meaning of the Agreement's terms must "be ascertained in accordance with its plainly expressed intent" because the definition of covered work is "clear and unambiguous."  *Tackett*, 574 U.S. at 435 (cleaned up).  As the Agreement is written, the work that the Funds contend is covered cannot comfortably fit within the definition of covered work.[7]

Because the language of the Agreement so clearly resolves the parties' dispute, the Court need not look to extrinsic evidence.  *See Flynn*, 481 F.3d at 830.  Many of the parties' disagreements are thus irrelevant.  It is unnecessary to consider evidence and testimony about

---

[7] The Funds cite the definition of "work" under the Fair Labor Standards Act to argue that the trainings and safety program are covered hours.  Pls.' Mot. at 21.  But Miller "concedes time employees spend in training and the like constitute work . . . for which it must pay the employees."  Def.'s Opp'n/Cross-Mot. at 24.  As Miller explains, the issue before the Court "is not whether the time is compensable" as "work," but "whether the work is 'covered' by the Agreement."  *Id.*  It is not.

past performance, bargaining history, or the interpretation and administration of the Agreement. *See, e.g.*, Def.'s Opp'n/Cross-Mot. at 26; Pls.' Reply/Opp'n at 14–15.

More, that Miller pays the contractual wage for the trainings and safety meetings, that it pays benefits for some work that would not come under a plain reading of the Agreement, or that it changed its payroll codes to account for new contributions, *see, e.g.*, Pls.' Mot. at 20, 22, 24, 27, is irrelevant to what the Agreement means as a matter of law.  Likewise, that the Funds are unaware of other employers that interpret the Agreement the way Miller does, *see* Pls.' Reply/Opp'n at 14, does not affect the meaning of the Agreement's words.  Miller need not prove that it applied the Agreement just like other employers, only that it applied the Agreement as required by its terms.

**b.**

The Funds separately argue that the Agreement covers "show up" time, also called "reporting" or "rainout" time.  Pls.' Mot. at 30–35.  As relevant here, Article X of the Agreement—titled "Reporting Pay"—states:

> After a person has been hired and ordered to report to work at the regular starting time, and no work is provided for him on the day that he has so reported, he shall receive pay equivalent to two (2) hours at the rate applicable for that day.

Pls.' App. at 64.  Article X then provides that the operator "shall receive the equivalent of not less than four (4) hours" or "eight (8) hours pay for said day" when he performs at least some work.  *Id.*  This provision thus requires Miller to pay operating engineers when they cannot work a full day due to weather or other factors.  Miller records such time under the payroll code "M0/M7 ShowRain."  PSMF ⁋ 79.

Although this provision guarantees payment to union members for show up time, it makes no similar directive for fund contributions.  The Agreement mandates that Miller pay contributions on "*work* covered by th[e] Agreement."  Pls.' App. at 62 (emphasis added).  But as

Article X makes clear, Miller compensates operators with reporting pay when "*no work* is provided for [them]." *Id.* at 64 (emphasis added). It should go without saying that simply "report[ing] to work" does not come under Article I's definition of covered work—engineers are not "repair[ing], maint[aining], constructi[ng], install[ing], treating and reconditioning . . . pipeline systems" when they are not working at all. *Id.* at 59. Nor are they "operati[ng] and maint[aining] and repair[ing]" power operated equipment under Article VI. *Id.* at 63.

The Funds contend that the phrase "applicable rate" in Article X means that the operator should receive the "total economic package of wages and fringe benefits." Pls.' Mot. at 31. But the language of Article X convinces the Court otherwise. The provision provides only for "pay *equivalent to*" the hours that Miller would pay "at the rate applicable for that day." Pls.' App. at 64 (emphasis added). Miller does not dispute, and the Court assumes, that wages and benefits are typically bargained for together. *See* PSMF ⁋ 21. But Article X does not suggest that this particular rate of "pay" was negotiated at all. Rather, it is more naturally read as importing the wage rate that was bargained for the type of work the operator would have performed if he could work. That is why it states that Miller must pay compensation "*equivalent to*" that rate for reporting time.

The Funds also appear to invoke the general-specific canon. They contend that the more specific language in Article X supersedes the more general definition of covered work in Article I. *See* Pls.' Mot. at 33 ("There is simply nothing in Article I that supersedes the specific language of Article X . . . ."). Not so. It is true that "specific clauses prevail over general clauses." *Ohio Power Co. v. FERC*, 744 F.2d 162, 168 n.7 (D.C. Cir. 1984). But crucially, this "rule of construction . . . presumes that the clauses stand irreconcilably in conflict." *Id.* When,

however, "both the specific and general provisions may be given reasonable effect, both are to be retained." *Id.*

Articles I and X are not "irreconcilably in conflict."  Had Article X required employers to compensate operators with "pay *and fringe contributions* equivalent to [two, four, or eight] hours at the rate applicable for that day," the Funds' argument may have won the day.  In that case, mandating wage and fringe contributions when an operator did not perform any work would conflict with Article VI's requirement to pay wage and fringe contributions on "work covered" and Article I's definition of covered work.  But that is not the Agreement here.  The two provisions thus fit comfortably together, and both can "be given reasonable effect."  Miller must pay wages and fringe contributions for covered work, but only the applicable rate of pay for reporting time.

Other provisions in the Agreement confirm this reading.  Recall that Article VI requires Miller to pay wage and fringe benefits on "all *work covered* by th[e] Agreement."  Pls.' App. at 62 (emphasis added).  Articles VII and VIII, by contrast, require Miller to contribute to the National Training Fund and the Industry Advancement Fund for all hours "paid" to operating engineers.  Article VII states, as relevant here, that Miller must "pay into the IUOE National Training Fund the sum of ten cents ($.10) per hour for *all hours paid* by the employer to all employees covered by this agreement."  *Id.* at 63 (emphasis added).  And Article VIII states that employers such as Miller "shall pay to the DCA Industry Advancement Fund five cents ($.05) per hour for *each hour paid* by the employer to their employees covered under this agreement." *Id.* (emphasis added).

These specific provisions therefore require Miller to contribute to the National Training Fund and Industry Advancement Fund based on a different, more expansive, metric—all hours

"paid"—than other funds.  This difference in language must carry a difference in meaning.  A "cardinal interpretive principle" is that courts must "give meaning to all of [a contract's] provisions" and "render them consistent with each other."  *Beal Mortg., Inc. v. FDIC*, 132 F.3d 85, 88 (D.C. Cir. 1998) (cleaned up).  Were the Court to interpret show up pay as coming under the Agreement's definition of covered work, it would render the distinction between "all work covered by this Agreement" in Article I and all hours "paid" in Articles VII and VIII meaningless.

It is thus clear that, as for funds that are *not* the National Training Fund or Industry Advancement Fund, contributions are required *only* for *covered work*.[8]  Because, by definition, operating engineers do not "work" when Miller compensates them for reporting time and something cuts their workday short, Miller does not owe contributions on these hours.  The Agreement clearly and unambiguously does not require Miller to pay benefits on show up pay so the Court's "inquiry . . . proceed[s] no further."  *Reese*, 138 S. Ct. at 766 (cleaned up).

*          *          *

In sum, the Court finds as a matter of law that the Agreement does not cover—and therefore that Miller does not owe contributions on—hours recorded under the "T3/V5 Training OQ," "T9/W0 Training Other," and "36 Safety Meeting" payroll codes.  *See Pittston*, 984 F.2d at 473.  More, although the Agreement requires Miller to pay operators for reporting to work, the Court finds that it does not require Miller to also pay contributions on this time.  *See id.*  The

---

[8]  The Funds try to undermine this point by arguing that Miller has, in the past, contributed on the same number of hours to the National Training Fund as to the other Funds.  *See* Pls.' Mot. at 34.  But past practice is irrelevant.  The Court need not consider extraneous sources because the meaning is clear from the text.  *See Flynn*, 481 F.3d at 830.  Miller's interpretation of the Agreement does not affect how the Court construes it as a matter of law.

Court will therefore deny the Funds' motion for partial summary judgment and grant Miller's cross-motion on this issue.

**B.**

The Funds also argue that Miller has failed to maintain records that accurately distinguish between covered and noncovered work. *See* Pls.' Mot. at 35. The Funds contend that time recorded under two payroll codes—"W3/W4 Other" and "10/W2 Warehouse," which Miller contends do not capture covered time—"regularly include[s] work that Miller admits is covered under the terms of the Distribution Agreement." *Id.* at 44 (emphasis omitted). Because "vast majorities of the . . . data entries categorized under these specific payroll codes either do not provide any description whatsoever of the work performed, or provide vague and imprecise descriptions that make it impossible to discern the type of work performed," the Funds assert that it would be "impossible for the Funds, or an auditor, or the Court to determine whether work categorized under these payroll codes constitutes covered work if the Court endorses Miller's interpretation of the Distribution Agreement." Pls.' Reply/Opp'n at 38. They therefore seek contributions on all hours categorized under these payroll codes. Pls.' Mot. at 43–44.

**1.**

ERISA requires that "every employer shall, in accordance with such regulations as the Secretary may prescribe, maintain records with respect to each of his employees sufficient to determine the benefits due or which may become due to such employees." *See* 29 U.S.C. § 1059(a)(1). In *Combs v. King*, the Eleventh Circuit explained that this statute "places a duty upon the employer to maintain records that will permit a determination of when the benefits are

due for employees as well as the information necessary to enable the plan administrator to develop reports which are required by statute." 764 F.2d 818, 823 (11th Cir. 1985).[9]

*Combs* then considered whether the employer "had the burden of disproving the Trustee's estimate of the hours worked by [the] employees due to [the employer's] failure to maintain adequate records." *Id.* at 825. The court adopted a burden-shifting framework: "[W]here an employer fails to keep proper records in conformity with his statutory duty," the employee carries his burden if he proves he performed covered work and "if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Id.* at 826 (citing *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). The employer then has the burden to "disprove" the employee's "testimony that the Act was violated." *Id.* at 826 (cleaned up).

The Ninth Circuit adopted *Combs* in *Brick Masons Pension Trust v. Industrial Fence & Supply, Inc.*, 839 F.2d 1333, 1338 (9th Cir. 1988). There, the court explained that "the *fact* of damage [was] certain" because it was "undisputed that the Trust Funds received no contributions for work performed by [the employees] even though they did some covered work during the relevant time period." *Id.* (emphasis in original). Any uncertainty lay "only in the amount of damages." *Id.* (cleaned up). It then stated the *Combs* test: "[O]nce the Trust Funds proved the fact of damage and [the employer's] failure to keep adequate records, the burden shifted to [the employer] to come forward with evidence of the extent of covered work performed by the . . . employees." *Id.* at 1338–39. When the employer did not meet its burden, the court held that the funds were entitled to contributions for all hours in which the employees performed

---

[9] Miller does not appear to contest that it has a duty to keep accurate records, but it asserts that it has not violated its duty as a factual matter. *See* Def.'s Opp'n/Cross-Mot. at 27.

"some covered work."  *Id.* at 1339; *accord Mich. Laborers' Health Care Fund v. Grimaldi Concrete, Inc.*, 30 F.3d 692, 697 (6th Cir. 1994) (holding that where "it is impossible to determine with any precision the amount of contributions due to the Funds . . . an employer is liable for contributions on all hours worked during a period in which it has been demonstrated that some covered work was performed").

So under *Combs* and *Brick Masons*, for the burden to shift to the employer, the Funds must show (1) "the fact of damage" (*i.e.*, unpaid contributions) and (2) the employer's "failure to keep adequate records."  *Brick Masons*, 839 F.2d at 1338–39.[10]

The Funds contend, and Miller does not dispute, that *Combs* and *Brick Masons* provide the applicable legal framework.  *See* Pls.' Mot. at 35–38; Def.'s Opp'n/Cross-Mot. at 28–30.  Although the D.C. Circuit has not adopted the *Combs* burden-shifting test, the Court will assume that it governs.

## 2.

Applying the burden-shifting test here, perhaps the Funds have proven some unpaid contributions, or "the fact of damage."  *Brick Masons*, 839 F.2d at 1338.  The Funds point to five examples in which operators performed work covered by the Agreement—for example, "working on a new bore machine"—but Miller recorded their hours under the "W3/W4 Other"

---

[10]  Some courts have also emphasized the "just and reasonable inference" language from the Supreme Court's decision in *Anderson v. Mt. Clemens Pottery Co.* in stating that there are *three* requirements before the burden shifts to the employer: A plaintiff must show "(a) improper record-keeping by the defendants, (b) that employees performed work for which they were improperly compensated, and (c) 'the amount and extent of that work as a matter of just and reasonable inference,' before the burden shifts."  *Reilly v. Reem Contracting Corp.*, 380 F. App'x 16, 20 (2d Cir. 2010) (citing *Combs*, 764 F.2d at 826 and *Anderson*, 328 U.S. at 687); *accord Nelson v. Frana Cos., Inc.*, No. 13-cv-2219-PJS/SER, 2017 WL 1193991, at *12 (D. Minn. Mar. 30, 2017) (repeating this test and noting that "[a] plaintiff cannot simply prove that adequate records were not kept and that at least one hour was not reported").  But any difference in these two versions of the legal standard is irrelevant here.

and "10/W2 Warehouse" payroll codes (meant for noncovered work).  Pls. Mot. at 44–48.

Miller appears to acknowledge these errors.  *See* Def.'s Opp'n/Cross-Mot. at 28 (recognizing that

"Plaintiffs identify a few mistakes"); *but see id.* at 27 (calling these "five *alleged* errors"

(emphasis added)).

    The Court need not decide whether the Funds have proven the "fact of damage," though.

Even assuming they have, the Funds have not met their burden to show that Miller has "fail[ed]

to keep adequate records."  *Brick Masons*, 839 F.2d at 1338–39.  The Funds claim that the

Preliminary Assessment shows that Miller "admits that is has failed to report and submit

hundreds of thousands of dollars in contributions."  Pls.' Mot. at 42.  But the Funds' reliance on

the Preliminary Assessment is misplaced because the purpose of this internal evaluation remains

highly contested.  Miller argues that the Preliminary Assessment was prepared based on a new

framework agreed to earlier in this litigation under which Miller agreed to pay contributions on

some hours that it had not previously.  *See* Def.'s Opp'n/Cross-Mot. at 29–30.  If that is the case,

it would not be a reliable indicator that Miller inadequately kept time.

    The Funds also broadly argue that Miller's payroll records show errors "that are too

pervasive to fully convey in a filing with this Court" and that the "W3/W4 Other" and "10/W2

Warehouse" codes "regularly include *work that Miller admits is covered under the terms of the

Distribution Agreement*."  Pls.' Mot. at 43–44 (emphasis in original).  But the Funds provide

only five concrete examples.  While they contend this is so because Miller's data is inadequate,

*see* Pls.' Reply/Opp'n at 42–43, that fact is disputed.  Miller points out that the Funds' allegation

is unfounded because the Funds' auditors have been able to discern contributions from Miller's

payroll records in the past.  *See* Def.'s Opp'n/Cross-Mot. at 28–29.  Without more to go on, the

Court cannot determine whether Miller has in fact failed to maintain adequate records.

Granting summary judgment to either side would thus be premature. While perhaps there could be systemic errors in Miller's records, the Funds have not met their burden to show that here. This is so, in part, because there has been no audit as to the period at issue. *See* Pls.' Mot. at 49–50. That makes this case unlike many in which the *Combs*/*Brick Masons* framework is applied *after* an audit is conducted. *See, e.g.*, *Motion Picture Indus. Pension & Health Plans v. N.T. Audio Visual Supply, Inc.*, 259 F.3d 1063, 1066 (9th Cir. 2001) ("the Trustees met their first threshold burden, proving that N.T. Audio failed to keep adequate records," because "[t]he Plans submitted in support of their motion for summary judgment declarations of the auditors who examined those records" who "testified that N.T. Audio's records were insufficiently clear to determine precisely how many hours of covered work were performed by N.T. Audio's employees"). A genuine dispute of material fact remains: whether Miller's records are so inadequate that they would prevent auditors from determining the amount of unpaid contributions.

*   *   *

In conclusion, each party's motion for partial summary judgment will be granted in part and denied in part.[11] As to Count 1, the Court finds that Miller is entitled to summary judgment

---

[11] Miller has also moved to strike the declaration of Mark Maher, contending that the Funds failed to identify Maher as a witness in its disclosures. *See* Def.'s Mem. in Supp. of Mot. to Strike at 3, ECF No. 37-1. Federal Rule of Civil Procedure 37(c)(1) states that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." "A Rule 37(c)(1) exclusion, however, is an extreme sanction that should be used sparingly." *United States v. Honeywell Int'l Inc.*, No. 08-cv-0961-PLF, 2020 WL 5793307, at *5 (D.D.C. Sept. 29, 2020) (cleaned up). The Court agrees with the Funds that even if they violated Rule 26, such a failure would be harmless because Miller was on notice about the communication that is the subject of Maher's declaration. *See* Pls.' Mem. in Opp'n to Def.'s Mot. to Strike at 16, ECF No. 41; *cf. Sacchetti v. Gallaudet Univ.*, 344 F. Supp. 3d 233, 255 (D.D.C. 2018) ("[T]he [defendant's] failure to disclose this information was harmless because the plaintiffs were already aware of it and, therefore, does not

on the Funds' claim that Miller must pay contributions on hours recorded under the payroll codes "T3/V5 Training OQ," "T9/W0 Training Other," "36 Safety Meeting," and "M0/M7 ShowRain." Whether the Funds are entitled to contributions on all hours categorized under the payroll codes "W3/W4 Other" and "10/W2 Warehouse" remains disputed, though.

An audit, which the Funds request, is thus necessary to determine the adequacy of Miller's records. Indeed, the Funds alleged in their amended complaint that an audit would "permit [them] to determine whether the Defendant is properly reporting and paying the contribution amounts owed to the Plaintiffs." Am. Compl. ¶ 25. Miller apparently does not oppose the Funds' request. *See* Def.'s Opp'n/Cross-Mot. at 19–30; Pls.' Reply/Opp'n at 44. The Court will therefore grant summary judgment to the Funds on Count 2 of their amended complaint. *See* Am. Compl. ¶¶ 24–26.

## IV.

For these reasons, it is hereby

**ORDERED** that the Plaintiffs' [31] Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART. It is GRANTED as to Count 2 of the Plaintiffs' Amended Complaint. The Defendant shall accordingly submit to an audit. It is DENIED insofar as it alleges: that the Defendant owes unpaid contributions on hours recorded under the payroll codes "T3/V5 Training OQ," "T9/W0 Training Other," "36 Safety Meeting," and "M0/M7 ShowRain"; and that Miller failed to keep adequate records and owes contributions on hours recorded under the payroll codes "W3/W4 Other" and "10/W2 Warehouse." It is further

---

warrant a sanction pursuant to Rule 37."). The Court will accordingly deny Miller's motion. *See Brooks v. Kerry*, 37 F. Supp. 3d 187, 202 (D.D.C. 2014) ("The decision to grant or deny a motion to strike is vested in the trial judge's sound discretion." (cleaned up)). Even if the Court granted Miller's motion, the outcome here would not change.

**ORDERED** that the Defendant's [32] Motion for Partial Summary Judgment is GRANTED IN PART and DENIED IN PART.  It is GRANTED as to the Defendant's claim that it does not owe unpaid contributions on hours recorded under the payroll codes "T3/V5 Training OQ," "T9/W0 Training Other," "36 Safety Meeting," and "M0/M7 ShowRain."  It is DENIED insofar as it alleges that its recordkeeping is adequate and that it does not owe contributions on all hours categorized under the payroll codes "W3/W4 Other" and "10/W2 Warehouse."  It is further

**ORDERED** that the Defendant's [37] Motion to Strike is DENIED.

**SO ORDERED**.


Dated: March 29, 2021                                   _____

                                                        TREVOR N. McFADDEN, U.S.D.J.